**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| DAVID CODREA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-2201 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| BUREAU OF ALCOHOL, TOBACCO, | : | | |
| FIREARMS AND EXPLOSIVES, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This case arises out of a Freedom of Information Act ("FOIA") dispute between Plaintiff David Codrea and Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). ATF is a federal law enforcement agency tasked with enforcing federal firearm laws. Mr. Codrea seeks information from ATF regarding how it handled a handgun incident in 2018 allegedly involving Hunter Biden, son of then-Presidential candidate Joe Biden. The agency provided Mr. Codrea a *Glomar* response, refusing to confirm or deny the existence of any information on this incident. ATF claimed FOIA Exemptions 6 and 7(C), which requires the Court to weigh Hunter Biden's personal privacy interest against the public interest in disclosure. For the reasons described below, after weighing these respective interests under Exemption 7(C), the Court concludes that ATF's *Glomar* response is warranted.

## II. BACKGROUND

The facts behind this FOIA request involve the alleged disappearance of a handgun from a car belonging to Hunter Biden and the aftermath of that incident. Ex. A to Compl. ("Request

Letter"), ECF No. 1-1; Def.'s Mem. Points & Authorities Support Mot. Summ. J. ("Def.'s Mot.")

at 1, ECF No. 8.  According to a news article both parties cite, in October 2018, Hunter Biden's

sister-in-law Hallie Biden took his gun and threw it in a trash can behind a grocery store.  *See*

Def.'s Mot. at 15 n.1; Pl's Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 8 n.6, ECF No. 9

(citing Tara Palmeri & Ben Schreckinger, *Sources: Secret Service Inserted Itself into Case of*

*Hunter Biden's Gun*, Politico (Mar. 25, 2021, 4:30 AM), https://www.politico.com/news/

2021/03/25/sources-secret-service-inserted-itself-into-case-of-hunter-bidens-gun-477879

("*Politico* Article")).

A series of events apparently ensued.  According to the article, Delaware State Police

arrived at the scene to investigate the missing gun.  *Id.*  Meanwhile, United States Secret Service

agents allegedly entered the store where Hunter Biden purchased the gun and asked the owner

for the firearms transaction record.  *Id.*  The store owner apparently refused to provide it on the

basis that the records fell under ATF's authority.  *Id.*  Later that day, ATF agents allegedly

approached the store owner to inspect the same record.  *Id.*  The article reports that the Secret

Service has denied involvement in this alleged incident.  *Id.*  Likewise, ATF represents to the

Court that ATF has never officially acknowledged involvement or even awareness of this

incident.  Def.'s Mot. at 14.

The article further claims that a copy of Hunter Biden's firearms transaction record

reveals that he responded "no" to a question on the form that asks, "Are you an unlawful user of,

or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled

substance?"  *Politico* Article.  The article reports that five years earlier, Hunter Biden was

discharged from the Navy Reserve after testing positive for cocaine.  *Id.*  It further claims that

"he and family members have spoken about his history of drug use."  *Id.*  In 2021, Hunter Biden

published a memoir which purportedly includes descriptions of his drug usage.  Ex. E to Compl.

(citing Elisabeth Egan, *Hunter Biden's Memoir: 7 Takeaways from 'Beautiful Things'*, N.Y.

Times (last updated Sept. 4, 2021), https://www.nytimes.com/2021/03/30/books/hunter-biden-

beautiful-things-memoir.html), ECF No. 1-5.

Mr. Codrea is a self-described internet blogger and journalist.  Compl. ¶ 4, ECF No. 1.

On November 23, 2020, he submitted a FOIA request to ATF that provided the following

background information:

> On or about October 18, 2018, a handgun disappeared from a car belonging to
> Robert Hunter Biden, son of Democrat presidential candidate Joe Biden.  On Oct. 29,
> 2020, The Blaze, a national news website, reported the Delaware State Police informed
> their reporter that the case was referred for a decision on prosecution.

Request Letter at 1.[1]  The letter then asked for

> copies of law enforcement and administrative reports, communications,
> correspondence, and work papers, including with internal State of Delaware DOJ, the
> Delaware State Police, any local law enforcement and any relevant federal agencies
> including ATF and the United States Secret Service.  This includes any case handling
> instructions from overseeing administrative authorities and/or agencies that would
> explain why over two years later, there has still been no public report or explanation as
> to the way the case has been resolved and why.

*Id.*  ATF acknowledged Mr. Codrea's request on February 26, 2021.  Ex. B to Compl., ECF No.

1-2.  On March 31, 2021, ATF informed Mr. Codrea that it had conducted a search in its

"systems of records that contain all investigative files compiled by ATF for law enforcement

purposes" and "w[as] not able to locate any responsive records."  Ex. C to Compl. at 1, ECF No.

1-3.  Two days later, ATF told Mr. Codrea that it was withdrawing its March 31 response

because it was premature and explained that the agency was planning to conduct a full search.

Ex. A to Siple Decl., ECF No. 8-2; Siple Decl. ¶ 5, ECF No. 8-1.  On May 12, 2021, ATF again

---

[1] Robert Hunter Biden appears to go by his middle name, so this Opinion will refer to
him as Hunter Biden.

changed course, this time informing Mr. Codrea that any initial search was conducted in error

and the request should have been categorically denied without a search "due to the substantial

privacy interests of the subject of the FOIA request," who was "a third party and private citizen."

Ex. D to Compl. at 1, ECF No. 1-4.  ATF explained that "the existence of any such material is

exempt from disclosure under FOIA" and invoked Exemptions 6 and 7(C).  *Id.*  Mr. Codrea

appealed this decision to the Office of Information Policy ("OIP") at the Department of Justice

("DOJ").  Ex. F to Compl., ECF No. 1-6.  After OIP denied the appeal, Mr. Codrea brought suit.

Ex. G to Compl. at 1, ECF No. 1-7; Compl.  ATF now moves for summary judgment on the

propriety of its *Glomar* response.  ECF No. 8.  In support of its motion, it relies on the

declaration of Adam C. Siple, the Chief of Information and Privacy Governance at ATF.  Siple

Decl. ¶ 1.[2]  That motion is now ripe for decision.

### III.  LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy

and to open agency action to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S.

164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  It "directs that

'each agency, upon any request for records . . . shall make the records promptly available to any

person' unless the requested records fall within one of the statute's nine exemptions."  *Loving v.

Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)).  "Consistent

---

[2] Mr. Codrea claims to have submitted a "substantively identical" FOIA request to the Secret Service.  Pl.'s Opp'n at 2.  The Secret Service informed Mr. Codrea that it conducted a search but could not locate any responsive records.  Tyrrell Decl. ¶ 10.  Mr. Codrea has since voluntarily dismissed that case.  Pl.'s Opp'n at 2 (citing *Codrea v. U.S. Secret Service*, No. 21-cv-1167 (D.D.C.)).  The Secret Service is not a party to this action.  Although the Secret Service's search for records without invoking *Glomar* appears to contrast the approach now taken by ATF, Mr. Codrea does not argue that one agency's approach to a similar FOIA request in any way impacts another agency's approach to its own request.

with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass." *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).  "The agency bears the burden of establishing that a claimed exemption applies."  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just. (*"*CREW*"*)*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing whether the movant has met that burden, a court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence."  *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008).  Because FOIA cases do not ordinarily involve disputed facts, they "are typically and appropriately decided on motions for summary judgment."  *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009) (citations omitted).  An agency may show that it is entitled to summary judgment by submitting affidavits that, in "reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Id.* (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).  An agency's justification for withholding records "is sufficient if it appears 'logical' or 'plausible.'"  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007)).

Instead of searching for and withholding exempt records, "an agency may issue a *Glomar* response, *i.e.,* refuse to confirm or deny the existence or nonexistence of responsive records if the particular FOIA exemption at issue would itself preclude the acknowledgement of such documents."  *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting *Wolf*,

473 F.3d at 374.[3]  In considering a *Glomar* response, courts apply the "general exemption review standards established in non-*Glomar* cases."  *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021) (quoting *Wolf*, 473 F.3d at 374)).  "An agency thus bears the burden to sustain a *Glomar* response."  *Id.* (citing 5 U.S.C. § 552(a)(4)(B)).[4]

## IV.  ANALYSIS

ATF relied on FOIA Exemptions 6 and 7(C) as grounds for its *Glomar* response. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). Exemption 7(C) protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

These exemptions are similar in some respects.  *See Rodriguez v. U.S. Dep't of Army*, 31 F. Supp. 3d 218, 230 (D.D.C. 2014).  Both require agencies and reviewing courts to "balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information."  *Beck v. Dep't of Justice,* 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting *Davis v. Dep't of Justice,* 968 F.2d 1276, 1281 (D.C. Cir. 1992)).  Although the

---

[3] The term "*Glomar* response" is derived from a ship, the *Glomar Explorer*, at issue in a FOIA case, *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).  *See Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021).

[4] Although ATF did not assert a *Glomar* response in its first communication with Mr. Codrea, this mistake did not waive its *Glomar* response.  *See Mobley v. CIA*, 806 F.3d 568, 584 (D.C. Cir. 2015) (agency's "simple clerical mistake" does not waive *Glomar* response); *Montgomery v. IRS*, 330 F. Supp. 3d 161, 169 (D.D.C. 2018) (government's "honest mistake" "does not amount to an official acknowledgement" for *Glomar* purposes).  Mr. Codrea does not dispute this point.  *See* Pl.'s Opp'n at 12 (conceding that ATF's argument that it did not waive its *Glomar* response is "probably correct" and that "Plaintiff does not challenge that a *Glomar* [response] would be appropriate" on procedural grounds).

balancing test is applied to both Exemption 6 and 7(C), "[t]he protection available under these exemptions is not the same." *Beck*, 997 F.2d at 1491.  Exemption 7(C) "provides broader privacy protection than Exemption 6 and thus 'establishes a lower bar for withholding material.'" *CREW*, 746 F.3d at 1091 n.2 (quoting *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011)).  First, Exemption 6 "encompasses 'clearly unwarranted' invasions of privacy, while Exemption 7(C) omits the adverb 'clearly.'"  *Braga v. FBI*, 910 F. Supp. 2d 258, 267 (D.D.C. 2012).  Second, Exemption 7(C) lowers the risk of harm standard from "would" to "could reasonably be expected to" constitute an invasion.  *Id.*  The differences in the language between the two exemptions reflect Congress's decision to provide the government with "greater flexibility in responding to FOIA requests for law enforcement records or information" than in responding to requests for personnel, medical, and other similar files.  *See U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 777 n. 22. (1989).  Accordingly, when all of the requested information serves a law enforcement purpose, courts will "confine [the] analysis to Exemption 7(C)."  *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Hum. Servs. (*"*PETA*"*)*, 745 F.3d 535, 541 (D.C. Cir. 2014).

"To meet its burden of establishing that Exemption 7(C) applies, the agency must demonstrate that (1) disclosure could 'reasonably be expected to constitute an unwarranted invasion of privacy' and (2) the 'personal privacy interest' is not 'outweighed by the public interest in disclosure.'"  *Elec. Priv. Info. Ctr. v. United States Dep't of Just.*, 18 F.4th 712, 718 (D.C. Cir. 2021) (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 160 (2004)).  "Once the agency shows that the 'privacy concerns addressed by Exemption 7(C) are present,' the party seeking disclosure must show 'that the public interest sought to be advanced is a

significant one, an interest more specific than having the information for its own sake,' and that 'the information is likely to advance that interest.'" *Id.* (quoting *Favish*, 541 U.S. at 172).

The Court's analysis will proceed as follows.  First, it clarifies that the proper scope of Mr. Codrea's FOIA request is limited to ATF's records about the 2018 handgun incident.  Then, it finds that the requested information, if it exists, would have been compiled for law enforcement purposes.  Next, it describes Hunter Biden's privacy interest and the public interests at stake.  Finally, after balancing these interests under Exemption 7(C), it concludes that ATF is entitled to assert a *Glomar* response here.

### A.  Scope of the Request

The parties first dispute the scope of Mr. Codrea's FOIA request.  ATF construes the request to seek information about "the alleged October 2018 incident involving the disappearance of a handgun from Mr. Biden's car."  Def.'s Reply Support Mot. Summ. J. ("Def.'s Reply") at 3, ECF No. 10.  Mr. Codrea, on the other hand, avers that information about a "criminal investigation" into Hunter Biden constitutes "only a portion of the request"—he claims that the request also seeks general information about the agency's "enforcement of federal gun control laws."  Pl.'s Opp'n at 3.  According to Mr. Codrea, these "other records" could include, for example, ATF's stance toward "self-admitted users of controlled substances" and its prosecution policies regarding "members of high-ranking families."  *Id.* at 4–5.  As support for his interpretation, Mr. Codrea points out that the request specifically asked for "administrative reports, communications, correspondence, and work papers."  *Id.* at 3 (citing Request Letter at 1).

The Request Letter supports ATF's view.  The letter begins by informing ATF of the relevant background: "[o]n or about October 18, 2018, a handgun disappeared from a car

belonging to Robert Hunter Biden, son of Democrat presidential candidate Joe Biden."  Request Letter at 1.  It then asks for "copies of law enforcement and administrative reports, communications, correspondence, and work papers" "including any case handling instructions" that would explain "the way *the case* has been resolved and why."  *Id.* (emphasis added).  In other words, Mr. Codrea sought "records *about* the alleged October 2018 incident involving the disappearance of a handgun from Mr. Biden's car."  Def.'s Reply at 3 (emphasis in original); *see* Pl.'s Opp'n at 2 (Plaintiff submitted a FOIA request to ATF "regarding a 'lost' firearm belonging to Hunter Biden").  ATF is right that the request does not seek records explaining the agency's enforcement policies—"unless they were also about the alleged handgun incident involving Mr. Biden."  Def.'s Reply at 4.  The inclusion of "administrative reports, communications, correspondence, and work papers" merely attempts to capture the various forms of potentially responsive records; it does not expand the scope of the request itself.

Mr. Codrea's contrary interpretation makes no sense.  If the sentence containing "administrative reports, communications, correspondence, and work papers" broadens the request, it would sweep too broadly.  That sentence, read alone, would seek virtually *all files* within ATF's possession regardless of subject matter, which is plainly impermissible.  *See Jud. Watch, Inc. v. United States Dep't of State*, 681 F. App'x 2, 4 (D.C. Cir. 2017) ("[A]n agency need not respond to overly broad and unreasonably burdensome requests." (citing *Am. Fed'n of Gov't Emps. v. Dep't of Commerce*, 907 F.2d 203, 208–09 (D.C. Cir. 1990)).  The request only makes sense when considered against the letter's factual background and the context of the entire paragraph.  *Cf. Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1241 (D.C. Cir. 2018) (interpreting a statute requires looking at "the broader context . . . as a whole") (citation omitted)).  Although an agency "has a duty to construe a FOIA request liberally," *Nation Mag., Washington Bureau v.*

*U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), it is "not obliged to look beyond the four corners of the request," *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996).  As in any FOIA case, "it [i]s Plaintiff's responsibility to frame its own FOIA request with sufficient particularity," and he "cannot now complain that it was looking for records that it did not describe." *Jud. Watch, Inc. v. Dep't of State*, 177 F. Supp. 3d 450, 456 (D.D.C. 2016), *aff'd*, 681 F. App'x 2 (D.C. Cir. 2017).  Of course, Mr. Codrea is free to file a FOIA request seeking such records if he wishes.  But the scope of the current request is limited to the agency's records about the 2018 handgun incident.

## B.  Law Enforcement Purpose

Exemption 7(C) protects records that must, as a threshold issue, be "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  That requires the record to be "created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption." *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex. ("PEER")*, 740 F.3d 195, 203 (D.C. Cir. 2014).  An agency whose "principal function is law enforcement" is entitled to deference when it claims that records were compiled for law enforcement purposes. *Id.* at 203.  Yet this deferential standard of review is not "vacuous." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998) (quoting *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir. 1982)).  Even a law enforcement agency must establish: (1) "a rational nexus between the investigation and one of the agency's law enforcement duties," and (2) "a connection between an individual or incident and a possible security risk or violation of federal law." *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (citing *Campbell v. Dep't of Just.*, 164 F.3d 20, 32 (D.C.Cir.1998)).

Here, ATF's "principal function is law enforcement." *Cooper v. U.S. Dep't of Just.*, No. 99-cv-2513, 2022 WL 602532, at *28 (D.D.C. Mar. 1, 2022); *see McRae v. U.S. Dep't of Just.*, 869 F. Supp. 2d 151, 164 (D.D.C. 2012).   ATF "is a criminal and regulatory enforcement agency in the DOJ with the authority and responsibility to investigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson."   Siple Decl. ¶ 11.   In this case, Mr. Codrea seeks information from ATF about the 2018 handgun incident.   ATF claims that "[t]o the extent records responsive to Plaintiff's request exist, they would have been compiled by ATF, a law enforcement agency, during the course of a valid law enforcement investigation."   *Id.*   It explains this is so because "ATF's sole focus with regard to alleged firearms violations is to determine whether violations of law occurred . . . ."   Def.'s Reply at 4–5.   ATF's representation is entitled to deference, and the Court finds that it is not "controverted by either contrary evidence in the record nor by evidence of agency bad faith."   *Moore*, 601 F. Supp. 2d at 12.   The "nexus" between ATF's law enforcement duties and these records (to the extent they exist) is plainly rational, *Blackwell*, 646 F.3d at 40, as any responsive records ATF possesses "would be part of an investigation by a law enforcement agency into alleged illegal acts."   Def.'s Mot. at 7 (citing *McMichael v. Dep't of Def.*, 910 F. Supp. 2d 47, 53 (D.D.C. 2012)).   Even Mr. Codrea admits that his request seeks "what the agency did (or ultimately did not do) relating to its *enforcement* of federal gun control laws."   Pl.'s Opp'n at 3 (emphasis added).   Accordingly, ATF has satisfied Exemption 7(C)'s threshold requirement that the requested information, if it exists, was compiled for law enforcement purposes.

## C.  Balance of Interests

### 1.  Privacy Interest[5]

On the privacy interest side of the scale, Exemption 7(C)'s protective standard derives from the fact that the very "mention of an individual's name" in law enforcement records could "engender comment and speculation and carries a stigmatizing connotation."  *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (quoting *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 666 (D.C. Cir. 2003)).  Accordingly, "th[e] disclosure of [ ] personally identifying information in [a law enforcement agency's] files implicates strong privacy interests." *Woodward v. U.S. Marshals Serv.*, No. 18-cv-1249, 2022 WL 296171, at *4 (D.D.C. Feb. 1, 2022); *see PETA*, 745 F.3d at 541 ("Courts have repeatedly recognized the 'substantial' privacy interest held by 'the targets of law-enforcement investigations . . . in ensuring that their relationship to the investigations remains secret.'" (quoting *Roth*, 642 F.3d at 1174)).

Here, disclosure would reveal whether Hunter Biden was criminally investigated by ATF. *See* Def.'s Mot. at 1; Request Letter at 1 (seeking "case handling instructions" and information about "the way the case has been resolved and why").  For that reason, Hunter Biden has a substantial privacy interest "in ensuring that [his] relationship to [any] investigation[] remains secret."  *PETA*, 745 F.3d at 541; *see* Pl.'s Opp'n at 10 (acknowledging that ATF's confirmation of an investigation into Hunter Biden "would unquestionably implicate Mr. Biden's privacy interests").  In response, Mr. Codrea cites several news articles in an apparent effort to show that actions taken by either Hunter Biden or others have diminished his privacy interest.  He is mistaken on both fronts.

---

[5] "Mr. Codrea did not provide a signed privacy waiver [from Hunter Biden] . . . that might authorize the release of information."  Siple Decl. ¶ 3 (quoting 28 C.F.R. § 13.3).  Thus, the Court will examine Hunter Biden's privacy interests on the merits.

First, none of Hunter Biden's actions has diminished his privacy interest.  Generally, an individual's "well-publicized announcement" that he was the subject of an investigation diminishes his privacy interest in "that very fact."  *CREW*, 746 F.3d at 1092 (citing cases).  Mr. Codrea cites a news article stating that an FBI-seized laptop shows that Hunter Biden allegedly sent text messages discussing the handgun incident and a police investigation.  Pl.'s Opp'n at 10. The Court is skeptical that one's private texts can so easily be repurposed into public acknowledgment of a criminal investigation.  *Cf. Nation Magazine*, 71 F.3d at 896 & n.10 (individual's "voluntary decision" to publicly connect himself to events "differentiates his privacy interest" from others "who did not voluntarily divulge their identities").  Even assuming, without granting, that these texts constitute a public statement by Hunter Biden, they still do not diminish his privacy interest because "acknowledging a police investigation is not the same thing as acknowledging an ATF investigation."  Def.'s Reply at 5.  After all, the article claims that his texts discuss a "*state* police investigation."  *Id.* (emphasis added); *cf. CREW*, 746 F.3d at 1092 (FBI's *Glomar* response inappropriate because individual gave "well-publicized announcement" that he was subject of investigation by that agency).  Thus, there is no basis to think that Hunter Biden publicly volunteered or discussed any information connecting him *to an ATF investigation*.

Nor did Hunter Biden's privacy interests diminish because he published a memoir that purportedly discusses his drug usage.  Pl.'s Opp'n at 7; Ex. E to Compl.  Mr. Codrea places great emphasis on the existence of the memoir, but the Court fails to see how it reduces Hunter Biden's privacy interest in *whether ATF investigated him*.  It is true that the Gun Control Act, which ATF enforces, prohibits an unlawful user of any controlled substance to use firearms and for any firearm purchaser to give false statements on a firearms transaction record.  Def.'s Mot.

at 15; Pl.'s Opp'n at 10–11 (citing 18 U.S.C. § 922(g)(3); (a)(6)).  But an individual's public disclosure of information that could be potentially incriminating in a general sense does not reduce his privacy interest in whether he was the subject of a particular federal criminal investigation by a particular agency.  *Cf. Lindsey v. FBI*, 490 F. Supp. 3d 1, 19 (D.D.C. 2020) (individual's statements to media about involvement were "narrow" and "d[id] not necessarily" "admit that he was a subject of investigative interest to the FBI").  The Court rejects Mr. Codrea's "cramped notion of personal privacy."  *Reporters Committee*, 489 U.S. at 763.

Second, no outside event has diminished Hunter Biden's privacy interest, either.  Mr. Codrea cites a news article reporting that Delaware State Police had referred the handgun incident for state prosecution.  Pl.'s Opp'n at 8 n.5; Request Letter at 1.  But once again, this information does not impinge on Hunter Biden's privacy interest with respect to *an ATF investigation*.  Mr. Codrea does not aver that the existence of an investigation by Delaware authorities implies whether (or how) ATF, a federal agency, conducted its own investigation.  After all, Delaware's law enforcement agencies are separate and distinct from ATF, a federal agency tasked with the enforcement of federal firearm laws.  Siple Decl. ¶ 11; Pl.'s Opp'n at 10–11.

In addition, Mr. Codrea cites a news article alleging that shortly after the 2018 handgun incident, ATF agents entered the store where Hunter Biden purchased his gun and inspected his firearms transaction record.  Pl.'s Opp'n at 7–8.  But ATF in this case has never acknowledged that such a visit occurred, much less that it opened an investigation.  *Compare* Compl. ¶ 7 ("It was widely reported that this [incident] was investigated by . . . Bureau of Alcohol, Tobacco, Firearms and Explosives."), *with* Answer ¶ 7, ECF No. 4 ("Defendant otherwise lacks knowledge or information sufficient to form a belief as to the truth of the [ ] allegations in this

paragraph."); Def.'s Mot. at 14.  Nor has Mr. Codrea supplied any source, agency or otherwise, confirming that the agency initiated an investigation into Hunter Biden.  Thus, the relevant question here is whether news reports insinuating (or consistent with) an agency investigation can, on their own, materially diminish an individual's privacy interest.

Under the D.C. Circuit's decision in *PETA*, the answer is no.  745 F.3d 535.  In that case, PETA sought investigatory records from the National Institutes of Health ("NIH") related to three grant recipients for alleged mistreatment of animals in a research facility at Auburn University.  *Id.* at 538.  The NIH filed a *Glomar* response, arguing that the existence of any investigatory records on the three researchers was exempt under Exemption 7(C).  *Id.*  PETA argued that these researchers had materially diminished privacy interests because Auburn University (who ran the facility) had already acknowledged the existence of an NIH investigation into these individuals.  *Id.* at 542.  Despite this evidence, the D.C. Circuit squarely rejected PETA's argument, reasoning that "NIH's own official acknowledgment that it had investigated the named researchers would carry an added and material stigma."  *Id.*  Because the "official acknowledgment by the agency itself" of an investigation carried "special significance," the absence thereof showed that the individuals still retained "substantial privacy interests at stake."  *Id.*  Here, as in *PETA*, ATF has never officially acknowledged that it investigated Hunter Biden.  If acknowledgment of an investigation by the entity running the research facility in *PETA* did not materially diminish the researchers' privacy interest, neither could second-hand media reports of an ATF records inspection diminish Hunter Biden's privacy interest.  For all of these reasons, Hunter Biden's privacy interest is substantial.

## 2. Public Interest

### *a. Whether Mr. Codrea Must Demonstrate Agency Misconduct under* Favish

On the other side of the balance lies the public interest.  The parties agree that Mr.

Codrea must show that "the public interest sought to be advanced is a significant one, an interest

more specific than having the information for its own sake," and that "the information is likely to

advance that interest."  *Favish*, 541 U.S. at 172; Def.'s Mot. at 11; Pl.'s Opp'n at 5; *see Bartko v.*

*United States Dep't of Just.*, 898 F.3d 51, 72 (D.C. Cir. 2018) (burden is on requester to make

this showing).  But they do not agree whether this is the only showing Mr. Codrea must make.

ATF argues that because Mr. Codrea is attempting to uncover government misconduct, he must

under Supreme Court precedent also "produce evidence that would warrant a belief by a

reasonable person that the alleged Government impropriety might have occurred."  Def.'s Mot.

at 12 (quoting *Favish*, 541 U.S. at 174).

This is a close call, but the Court concludes that Mr. Codrea need not make an

evidentiary showing of government misconduct.  ATF is correct that *Favish* requires "the

requester [to] establish more than a bare suspicion in order to obtain disclosure" when "the

public interest being asserted is to show that responsible officials acted negligently or otherwise

improperly in the performance of their duties."  541 U.S. at 174.  Portions of Mr. Codrea's

briefing undoubtedly support the notion that he is seeking to uncover government misconduct

here.  *See* Pl.'s Opp'n at 7 (describing this incident as "a particularly egregious case of willful

failure to enforce the laws"); *id.* at 8 (incident leaves "a 'reasonable person' with the belief that a

'federal agent or employee acted improperly to benefit the President's son'"); *id.* (seeking to

expose the "failure of the government to prosecute certain individuals for crimes others would

undoubtedly be prosecuted for").  If this were the *only* public interest Mr. Codrea invoked, then

he would indeed need to "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174.[6]

But revealing government misconduct is not the only public interest in this case. Here, Mr. Codrea has identified a separate public interest in understanding ATF's substantive law enforcement policies. *See* Request Letter at 1 (seeking information about "case handling instructions" and "the way the case has been resolved and why"); Pl.'s Opp'n at 5 ("Codrea essentially requested information on 'why' the agency apparently chose not to enforce the statutes it is tasked to enforce."); *id.* at 6 (seeking information about "the agency's actions in choosing what crimes are serious enough to punish, and who is off limits to punish"); *id.* at 3 (seeking to understand "what the[] government is up to" and "the conduct of the agency tasked with enforcement of laws that apply to everyone else"). This Circuit has reiterated that "[m]atters of substantive law enforcement policy . . . are properly the subject of public concern whether or not the policy in question is lawful." *ACLU*, 655 F.3d at 14 (cleaned up). Thus, in *CREW*, the D.C. Circuit ruled that a FOIA requester seeking records related to the FBI and DOJ's declination to prosecute a public official did not need to produce evidence of government impropriety. 746 F.3d at 1094–95. The court found that the FBI's handling of the investigation constituted a substantive law enforcement policy because it could reveal "whether the government had the evidence but nevertheless pulled its punches." *Id.* at 1093. Because a matter of substantive law enforcement policy provides "a sufficient reason for disclosure

---

[6] Were this the standard in this case, Mr. Codrea would not be able to make this showing. "[T]here is a presumption of legitimacy accorded to the Government's official conduct," in part because "[a]llegations of government misconduct are easy to allege and hard to disprove." *Favish*, 541 U.S. at 174–75 (cleaned up). Here, Mr. Codrea's "bare suspicion" that ATF mishandled Hunter Biden's case falls short of this standard, because he has provided only assertions, not evidence, of agency misconduct. *Oguaju v. United States*, 378 F.3d 1115, 1117 (D.C. Cir. 2004) (quoting *Favish*, 541 U.S. at 174).

independent of any impropriety," the court explained that "[w]hether government impropriety might be exposed in the process is beside the point." *Id.* at 1095; *see also Electronic Privacy*, 18 F.4th at 720–21 (declining to require showing of government impropriety by FOIA requester who sought special counsel's report of Russian interference in U.S. elections because "[w]hether the Special Counsel adequately investigated and reached proper declination decisions as to potential crimes by members of the Trump campaign" was a matter of substantive law enforcement policy); *Showing Animals Respect & Kindness v. U.S. Dep't of Interior*, 730 F. Supp. 2d 180, 195 (D.D.C. 2010) ("[T]he public has an interest in finding out whether and under what circumstances certain individuals receive preferential treatment from government investigators and prosecutors.").

Here, Mr. Codrea is "*not only*[] seeking to show that the government's [ ] policy is legally improper, but rather to show what that policy is and how" it is used. *ACLU*, 655 F.3d at 3 (emphasis added). Therefore, Mr. Codrea has "established a sufficient reason for disclosure independent of any impropriety," and need not produce any evidence of government impropriety under *Favish*. *CREW*, 746 F.3d at 1095; *see Electronic Privacy*, 18 F.4th at 718 ("Asserting certain *other* public interests . . . does not require such an evidentiary showing." (emphasis added)). As such, Mr. Codrea needs only to show that "the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and that "the information is likely to advance that interest." *Favish*, 541 U.S. at 172.

### b. Public Interest in Substantive Law Enforcement Policy

Before delving into an analysis of the public interest, the Court must first explain how it should be framed in this case. Although ATF filed a *Glomar* response, the public interest is not just in the *existence* of this information, but its *contents* as well. *See PETA*, 745 F.3d at 542–43

(*Glomar* case recognizing "cognizable public interest in learning how [agency] handles complaints" and "the public interest in understanding the agency's investigatory processes"). Some *Glomar* cases predating *PETA* confined the public interest analysis to the existence of responsive documents. *See, e.g.*, *Taplin ex rel. Lacaze v. U.S. Dep't of Just.*, 967 F. Supp. 2d 348, 354 (D.D.C. 2013); *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 898 F. Supp. 2d 93, 106 (D.D.C. 2012). But *Glomar* cases post-dating *PETA* have, like *PETA*, considered the public interest in what the records themselves reveal (that is, after all, what Mr. Codrea seeks). *See, e.g.*, *DBW Partners, LLC v. USPS*, No. 18-cv-3127, 2019 WL 5549623, at *6 (D.D.C. Oct. 28, 2019) (where USPS issued *Glomar* response to a request for investigative material on USPS officer's conduct, court found public interest in records that "could shed light on how the USPS responds" to officer conduct); *Prop. of the People, Inc. v. Dep't of Just.*, 405 F. Supp. 3d 99, 117 (D.D.C. 2019) (finding that plaintiffs "have demonstrated that there is a significant public interest in the requested records" which would reveal "how the FBI handled" the investigation). Accordingly, the Court will follow *PETA*'s framing of the public interest in *Glomar* cases.

The public interest in ATF's handling of this case is significant. Recall that in *CREW*, the D.C. Circuit observed that the FBI and DOJ's "handl[ing of] the investigation and prosecution" was a matter of substantive law enforcement policy and therefore a cognizable public interest. *Id.* at 1093. Here, the public has an interest in knowing how ATF handled the 2018 handgun incident, including whether (and with what diligence) it investigated Hunter Biden, and whether ATF "pulled its punches." *Id.* Moreover, this incident has been the subject of some media and congressional attention. *Cf. ACLU*, 655 F.3d at 12 ("widespread media attention" and "congressional" inquiry reveal "considerable public interest"). *But see Politico* Article ("The incident has received scant attention[.]"). In the first months of President Biden's

administration, twenty-two House of Representative members asked the then-nominated Director of ATF to "publicly commit to investigate allegations that Hunter Biden falsified information during a background check in order to illegally obtain a firearm." Pl.'s Opp'n at 9 (citing Letter from Bob Good, Member of Congress, to David Chipman (Apr. 26, 2021), https://good.house. gov/sites/evo-subsites/good.house.gov/files/evo-media-document/Letter%20to%20Nominee% 20Chipman.pdf ("Congressional Letter")). The letter claimed that "[m]any Americans are rightfully alarmed" by Hunter Biden's alleged false statement on the firearms transaction record. Congressional Letter at 1. Thus, the public interest in this case is significant.

### 3. Balancing the Privacy and Public Interests

Having articulated the privacy and public interests, the Court must now "balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information." *Dillon v. U.S. Dep't of Just.*, 444 F. Supp. 3d 67, 94 (D.D.C. 2020) (quoting *Beck v. DOJ*, 997 F.2d 1489, 1491 (D.C. Cir. 1993)). As described above, Hunter Biden has a substantial privacy interest, and the public interest is also significant. But the balance is not deadlocked. *PETA* instructs that "the public interest in shedding light on agency investigatory procedures," "without more," is "insufficient to justify disclosure when balanced against the substantial privacy interests weighing against revealing the targets of a law enforcement investigation." *PETA*, 745 F.3d at 543 (citing cases that "consistently" produced this result). That is the case here. Using the Circuit's precedents in *PETA* and *CREW* as a guide, the Court concludes that Hunter Biden's privacy interests outweigh the public interest in disclosure.

The privacy interest here is remarkably strong. Recall that *PETA* found "substantial privacy interests at stake" for the NIH-funded researchers in that case. *Id.* at 542. Hunter

Biden's privacy interest is even stronger.  Unlike the request for "non-criminal" investigatory information regarding grant violations in *PETA*, *id.* at 541, the request here seeks information about a *criminal* investigation, which would directly "tar[] [Hunter Biden] with the brush of *criminal* activity," *Nation Magazine*, 71 F.3d at 894 n.8 (emphasis in original).  And whereas the research center in *PETA* had already "publicly acknowledged complaints and investigations involving the named researchers," no source has acknowledged any ATF investigation into Hunter Biden.  *PETA*, 745 F.3d at 542.  In light of the "material difference[s]" between these two cases, Hunter Biden's privacy interest is "considerably stronger" here.  *Id.* at 543.

Likewise, Hunter Biden's privacy interest is also considerably stronger than that of the "former Majority Leader of the House of Representatives" in *CREW*.  746 F.3d at 1092.  In *CREW*, Mr. DeLay, the former Majority Leader, provided a "well-publicized announcement of th[e] very fact" that "he was the subject of an FBI investigation."  *Id.*  In addition, as a "public official at the time" of the events in question, he possessed a "somewhat diminished privacy interest."  *Id.*; *see Electronic Privacy*, 18 F.4th at 719 ("[P]ublic officials 'may have a somewhat diminished privacy interest' in the Exemption 7(C) balancing analysis.").  Given these facts, Mr. DeLay only retained "some privacy interest in the particulars of the investigation."  *CREW*, 746 F.3d at 1092.  By contrast, there is no evidence that Hunter Biden ever publicly acknowledged an ATF investigation.  Nor does Mr. Codrea allege that Hunter Biden was at any relevant time "a public official."  *Id.*  The Court is not aware of any caselaw holding that a private citizen like Hunter Biden loses a sense of personal privacy for purposes of Exemption 7(C) merely by being related to a prominent public official.  A rule like that would contradict the Circuit's "hesita[nce] to extend" the public-official doctrine.  *See Electronic Privacy*, 18 F.4th at 719 (refusing to extend doctrine "to private citizens serving on a presidential campaign").

The public interest in this case, by contrast, is weaker compared to *CREW*.  *CREW* involved a "wide-ranging public corruption investigation" that arose from "one of the most significant political corruption scandals in recent memory."  *Id.* at 1094.  There, Mr. DeLay's status as a senior ranking public official "raise[d] the stakes" of the public interest because it could "show whether prominent and influential public officials are subjected to the same investigative scrutiny and prosecutorial zeal as" the numerous other local officials and lobbyists who were investigated in the corruption scandal.  *Id.*  But here, Hunter Biden is a private citizen allegedly involved in a standalone handgun incident.  ATF's handling of this isolated incident represents a "single instance," *Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 388 (D.C. Cir. 2007), which may not necessarily "reveal a great deal about law enforcement policy," *CREW*, 746 F.3d at 1093; *see also id.* at 1096 ("[T]he FBI's and the DOJ's investigation of *major, wide-ranging* public corruption is more likely to shed light on how the agencies are performing their statutory duties than a discrete . . . proceeding." (emphasis added)).

Furthermore, unlike the Department of Justice in *CREW* that had the power to prosecute Mr. DeLay, ATF is not responsible for "prosecution decisions"; it can "only refer an investigation to a U.S. Attorney's Office."  Def.'s Reply at 6.  Thus, disclosure would reveal one phase of what the government is up to (investigation) but not necessarily shed light on prosecutorial decisionmaking regarding Hunter Biden.  *See id.* ("[T]he mere absence of a prosecution reveals nothing about whether ATF personnel engaged in misconduct.").  And even if disclosure could reveal whether the government pulled its punches in this particular case, that may say little about "who is off limits to punish," Pl.'s Opp'n at 6, because Mr. Codrea concedes that prosecutions for alleged false statements on firearms transaction records are already "exceedingly rare," Def.'s Mot. at 15; Pl.'s Opp'n at 6 n.2; *see* Congressional Letter at 1 ("Lying

on background checks is common . . . but rarely prosecuted.").  Compared to *CREW*, the "information" Mr. Codrea seeks is less "likely [to] advance th[e public] interest."  746 F.3d at 1093 (quoting *Favish*, 541 U.S. at 172)).

      To conclude, the Court finds that Hunter Biden's substantial privacy interest is not "outweighed by the public interest in disclosure."  *Electronic Privacy*, 18 F.4th at 718. Considering "the circumstances of this case," the Court "conclude[s] that the public interest in understanding the agency's investigatory processes fails to outweigh [Hunter Biden's] substantial interest in nondisclosure."  *PETA*, 745 F.3d at 543.

*         *         *

      In addition to correctly invoking Exemption 7(C), ATF properly applied it.  The Court finds that ATF's categorical approach of refusing to confirm or deny the existence of any information is the only "workable manner" of protecting Hunter Biden's privacy in this case. *Nation Magazine*, 71 F.3d at 893; *see PETA*, 745 F.3d at 544 (permitting blanket *Glomar* response "as to any documents that would confirm the existence of an investigation into the three named researchers").  As *PETA* recognized, the "uncertainty" a *Glomar* response creates is "essential to *Glomar*'s efficacy."  *Id.*  Here, because Hunter Biden is the focus of the 2018 handgun incident and allegedly the owner of the handgun, acknowledging that ATF investigatory files about this incident exist would inherently risk associating Hunter Biden with a criminal investigation.  Thus, requiring ATF to "submit a *Vaughn* Index" or the equivalent would "itself adversely affect [Hunter Biden's] interest in not being associated with an investigation in the first place."  *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 846 F. Supp. 2d 63, 76 (D.D.C. 2012); *see* Siple Decl. ¶ 11; *cf. Nation Mag. v. U.S. Customs Serv.*, 937 F. Supp. 39, 45 (D.D.C. 1996) (where Ross Perot "publicly confirmed" "alleged offers to assist [agency] in drug

interdiction," "privacy concerns that drive Exemption 7(C) may not be present with respect to *every* record in Customs' investigatory files regarding Mr. Perot" (emphasis in original)). Therefore, ATF's *Glomar* response was appropriate.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment (ECF No. 8).  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 13, 2022                                         RUDOLPH CONTRERAS
                                                                              United States District Judge